UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

UNITED STATES OF AMERICA,

    -  against  -

CLIVE DAVIS,

                               Defendant.

------------------------------------------------------------

**MEMORANDUM & ORDER**
14-CR-0567 (MKB)

MARGO K. BRODIE, United States District Judge:

Defendant Clive Davis, also known as "Cliver Davis," "Link Davis," "Olive Davis, Jr.,"

and "Clive Davis, Jr.," is charged in a one-count indictment with being a felon in possession of a

firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), 924(e) and 3351 *et seq*. On February

19, 2015, Defendant moved to suppress physical evidence acquired by law enforcement officers

after a search of his person on June 6, 2014. The Court held a suppression hearing on May 15,

2015. For the reasons discussed below, the Court denies Defendant's motion.

    **I.**    **Background**

        **a.**    **Facts alleged in the Complaint**

According to the criminal complaint filed on September 26, 2014, Defendant has twice

been convicted of a crime punishable by a term of more than one year of imprisonment. (Compl.

¶ 8.) On September 23, 1998, he was convicted of attempted robbery in the third degree in

Kings County Supreme Court, in violation of section 160.05 of the New York Penal Law. (*Id.*)

On September 10, 2010, Defendant was convicted of conspiracy to possess with intent to

distribute cocaine base in the District of Connecticut, in violation of 21 U.S.C. § 846. (*Id.*)

On or about June 6, 2014, at approximately 12:38 AM, two uniformed New York Police

Department ("NYPD") officers, Fink and Baldofsky, were on foot patrol in Brooklyn. (*Id.* ¶ 2.)

At the southeast Corner of Flatbush Avenue and Clarendon Road, Fink and Baldofsky observed an individual wearing blue jeans and a black t-shirt with a patterned design carrying an open, green beer bottle.  (*Id.* ¶ 3.)  The man, later identified as Defendant, was walking toward the officers on Clarendon Road when he threw the open bottle onto the ground.  (*Id.*)  After observing this, the officers approached Defendant.  (*Id.* ¶ 4.)  Defendant attempted to push past Fink and made contact with him, at which point Fink attempted to stop Defendant.  (*Id.*)  Defendant "attempted to resist Fink, and flailed his arms to avoid being stopped."  (*Id.*)

At this time, Baldofsky approached Defendant from behind and observed a large bulge in Defendant's back, near the waistband of his pants.  (*Id.* ¶ 5.)  Upon lifting Defendant's shirt, Baldofsky observed a gun, which he recovered and secured.  (*Id.*)  The gun was later identified as a black nine millimeter ("9MM") M11 Cobray semiautomatic handgun, which are manufactured outside of the State of New York.  (*Id.* ¶¶ 5–6.)  Defendant was handcuffed and patted down, at which point the officers discovered an ammunition clip containing twenty-five 9MM rounds in Defendant's left front pocket.  (*Id.* ¶ 6.)

### b.  Motion to suppress

On February 19, 2015, Defendant moved to suppress the physical evidence acquired by law enforcement officers on June 6, 2014.  (Def. Mot. to Suppress, Docket Entry No. 11.)  Defendant requested an evidentiary hearing.  (Decl. of Michael K. Schneider in Supp. of Def. Mot. to Suppress ("Schneider Decl.") 4, Docket Entry No. 11-1.)  Defendant argued that the evidence obtained during the June 6, 2014 encounter with the NYPD officers was the product of an illegal seizure and subsequent search of Defendant's person, which were not conducted pursuant to a warrant or justified by an "exception to the warrant requirement."  (Schneider Decl. 3–4.)  In an affirmation submitted on or about March 25, 2015, in support of his motion to

suppress, Defendant states that in the early morning hours of June 6, 2014, he was walking on a

public sidewalk in Brooklyn.  (Davis Aff. ¶ 2, Docket Entry No. 13-1.)  As he was walking,

police officers approached him and told him to stop.  (*Id.* ¶¶ 1–2.)  Defendant continued walking,

and the police officers "chased" him and "forced [him] to the ground."  (*Id.* ¶¶ 4–5.)  While on

the ground, the police officers searched the Defendant's person and found a gun in the waistband

of his pants, and a loaded magazine of ammunition in his pants pocket.  (*Id.* ¶ 6.)

Prior to the submission of Defendant's affidavit, the government sought denial of

Defendant's motion without an evidentiary hearing, arguing that Defendant did not submit an

affidavit based on personal knowledge in support of the motion, failing to create a factual dispute

to necessitate a hearing.  (Gov. Mem. in Opp'n to Mot. to Suppress ("Opp'n Mem.") 4–8.)  The

government further argues that the motion should be denied because the undisputed evidence

establishes that (1) there was probable cause to arrest Defendant, and search Defendant incident

to that arrest, (a) for carrying an open container of alcohol and (b) for littering, and (2) even if

there was no probable cause to arrest Defendant, the officers had reasonable suspicion to stop

Defendant and perform a protective pat-down search.  (Opp'n Mem. 5–15.)

   c.   **May 15, 2015 suppression hearing**

On May 15, 2015, the Court heard testimony from police officer Michael Baldofsky and

former police officer Michael Fink, and heard oral argument on the motion.  Except for some

minor inconsistencies in the testimony, discussed below, the Court finds that Balofsky and Fink

testified credibly as to their recollection of the events occurring between the evening of June 5,

2014 and the early morning hours of June 6, 2014.[1]  Based on the evidence presented at the hearing, the Court makes the following findings of fact.

On the evening of June 5, 2014, into the early morning hours of June 6, 2014, NYPD police officers Baldofsky and Fink were assigned to the "impact unit" in the 70th Precinct in Brooklyn, New York.  (Tr. of Suppression Hr'g held on May 15, 2015 ("Tr.") 4:24–5:4, 50:5–12.)  Their shift began at approximately 5:30 PM on June 5, 2014, and continued to approximately 2:05 AM on June 6, 2014.  (Tr. 6:2–4, 51:3–9.)  As part of the "impact unit," Balofsky and Fink were on foot patrol, in full uniform, in the area surrounding the intersection of Flatbush Avenue and Clarendon Road in Brooklyn, New York, and were tasked with addressing "quality of life issues."  (Tr. 6:8–7:2, 51:10–21.)  That night, it was clear and warm, and the officers spent approximately four hours patrolling the area, walking around the block and speaking to individuals whom they encountered.  (Tr. 10:2–4, 53:7–8, 72:12–18.)  Neither officer encountered significant vehicular traffic or foot traffic that evening.  (Tr. 37:10–14, 65:12–18.)

At approximately 12:40 AM on June 6, 2014, Baldofsky and Fink were standing on the southeast corner of the Intersection, an area lit by an overhead streetlamp and some lighting at a construction site across the street.  (Tr. 8:6–23, 10:7–14, 31:2–23, 40:3–4, 54:2–3.)  The officers were both standing parallel to the buildings on Clarendon Road, facing to the north, when they noticed Defendant walking west on Clarendon Road in their direction.  (Tr. 64:6–22.)  Defendant was wearing a multicolored shirt and jeans, and was holding what appeared to both officers to be

---

[1]  To the extent Baldofsky or Fink's testimony conflicts with Defendant's affidavit submitted in support of his motion to suppress, the Court credits the testimony, which was subject to cross-examination.  *See United States v. Iodice*, 525 F.3d 179, 185 (2d Cir. 2008).

a Heineken beer bottle in his hand.[2]  (Tr. 10:17–11:2, 54:19–55:1.)  The bottle was not obscured

by a paper bag, and Baldofsky testified that he was able to see that the bottle was open.[3]  (Tr.

11:19–12:3, 55:2–10.)  Neither officer witnessed Defendant drink from the bottle at any time.

(Tr. 38:2–5, 62:13–20.)  Baldofsky and Fink witnessed Defendant take a few more steps toward

them and lightly toss or drop the bottle a few feet away from him into a "planter" — a square

cut-out in the sidewalk, close to the road, where a tree was growing.  (Tr. 12:5–19, 40:12–41:2,

55:11–21.)  The bottle landed, intact, in the dirt surrounding the tree, and Baldofsky witnessed

liquid emptying from the bottle.[4]  (Tr. 12:30–21, 44:3–11, 56:9–13.)  Defendant continued to

walk toward the officers and the intersection with Flatbush Avenue.  (Tr. 12:22–25, 41:7–9,

56:14–17.)

Fink stepped forward and turned toward Defendant, blocking Defendant's path, while

Baldofsky remained on Fink's right side, with his body turned toward the opposite side of

Clarendon Road.  (Tr. 13:19–25, 41:14–18, 69:10–18.)  Fink said something to Defendant like

"stop" or "what's going on," though he could not recall what exactly he said.  (Tr. 41:23–42:2,

69:19–70:6.)  Defendant continued walking, brushing against or otherwise making physical

---

[2]  Baldofsky and Fink were not able to see the label from where they were standing — approximately twenty to thirty feet away from Defendant — but both testified that they recognized the color and shape of the bottle to be that of a Heineken beer bottle.  (Tr. 11:19–24, 38:20–39:2, 66:21–67:3.)

[3]  Baldofsky's assertion that he was able to see that the bottle was open is somewhat dubious, given the time of night, his distance from Defendant, the fact that the street did not appear to be particularly well-lit from photographic images presented at the suppression hearing, (*see* Gov. Exs. 3, 4), and the fact that both officers testified that Defendant was holding the bottle to his side or in front of his torso and was wearing a dark shirt, which would make it difficult to discern whether a dark green beer bottle had a cap on it or had any liquid in it.

[4]  This assertion is also somewhat improbable given the conditions on the street that evening and the distance between Baldofsky and Defendant.

contact with Fink, who put his hands up to grab Defendant by the arm or shoulder.  (Tr. 42:12–43:7, 57:6–20, 70:5–19.)  Defendant turned away from Fink, who noticed a bulge at the waistband of Defendant's pants.  (Tr. 57:19–20, 70:20–71:5.)  Fink hit the bulge with his hand, and determined that it felt metallic and sounded like metal.  (Tr. 59:24–58:9, 71:6–10.)  Fink then said "gun" and grabbed Defendant by the shoulders, at which point Baldofsky noted the bulge in Defendant's waistband, as well.[5]  (Tr. 14:11–14, 43:8–20, 71:25–72:3.)  Fink held Defendant while Baldofsky, believing the bulge was a firearm, lifted up Defendant's shirt, saw that there was a firearm in his waistband, removed it, and placed it on the sidewalk out of Defendant's reach.  (Tr. 14:15–15:1, 44:21–45:3, 58:13–14, 70:10–11.)  At the same time, Fink pulled Defendant to the ground and restrained him so he could not get away.  (Tr. 15:2–6, 58:13–18.)  Fink called for backup on his radio and both officers held Defendant with his hands behind his back until backup arrived approximately forty-five seconds to a minute later.  (Tr. 15:9–15, 58:17–3.)  Defendant was then handcuffed and placed under arrest and Baldofsky and one or two other police officers searched him.  (Tr. 15:16–24, 59:4–6.)  During the search, the searching officers found a loaded magazine in Defendant's pants pocket.  (Tr. 15:22–24, 33:17–22.)

Defendant was taken to the 70th precinct station house, and Baldofsky remained on the scene to gather pictures of the event and to preserve the evidence.  (Tr. 16:1–4, 59:23–60:2.)  Baldofsky requested that the NYPD emergency services unit ("ESU") report to the location to inspect the firearm, and he collected the discarded beer bottle from the planter, at which time he smelled beer in the bottle, although the bottle was empty.  (Tr. 24:9–24, 61:20–25.)  The firearm and beer bottle were placed on the sidewalk for a period of time, and when ESU arrived, they

_____

    [5]  Baldofsky did not testify to Fink saying "gun," but rather stated that he noticed the bulge in Defendant's waistband from where he was standing.

found no rounds in the chamber of the weapon.[6] (Tr. 18:2–20:13.) Baldofsky then took the firearm, magazine, and bottle to the 70th precinct, marked the items, and stored them for safekeeping. (Tr. 20:14–18, 60:5–18.) As part of this process, Baldofsky unloaded the magazine and found twenty-five individual rounds of ammunition. (Tr. 22:9–12.)

## II. Discussion

Defendant argues that the comprehensive search of his person was conducted without a warrant and was not the result of a valid stop or arrest, warranting the suppression of the physical evidence recovered from his person during the search. (Schneider Decl. 3–4.) Defendant contends that the police officers had neither probable cause to arrest him nor reasonable suspicion justifying a search of his person. (Reply Mem. in Support of Def. Mot. to Suppress ("Reply Mem.") 5–6.) The government argues that the police officers had probable cause to arrest Defendant for littering and for possessing an open container of alcohol in public (an "open container violation"), and thus had the authority to conduct a search incident to that arrest. (Opp'n Mem. 11.) The government further argues in the alternative that the police officers had reasonable suspicion to believe that Defendant had committed violations of the New York City administrative code — namely, littering and the open container violation — justifying an investigative stop. (*Id.* at 13.) Based on the events immediately following the officers' attempt to stop Defendant, the government argues that the officers were justified in performing a protective search of Defendant. (*Id.* at 13–14.)

---

[6] On June 10, 2014, Baldofsky testified in front of a New York State grand jury that he checked the gun and found that it was loaded with 9MM ammunition. (Tr. 46:13–47:18.) At the suppression hearing, Baldofsky explained that he had testified the gun was loaded because of the proximity of the magazine to the firearm; he believed that the prosecutor was asking for his conclusion about whether the gun was loaded within the terms of the law, and not about whether any bullets were actually in the chamber of the weapon. (Tr. 47:25–48:11.)

The Fourth Amendment protects individuals "against unreasonable searches and seizures."  U.S. Const. amend. IV; *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir. 2008) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  "A warrantless search is '*per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" *United States v. Aguiar*, 737 F.3d 251, 259 (2d Cir. 2013) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  One well-recognized exception to the warrant requirement is embodied in the search incident to arrest doctrine, under which police may search persons lawfully arrested to protect officer safety or to preserve evidence.  *Riley v. California*, 573 U.S. ---, 134 S. Ct. 2473, 2482–83 (June 25, 2014); *see also United States v. Williams*, 568 F. App'x 25, 27 (2d Cir. 2014) (noting exception for "searches incident to arrest, [which] permits the police to search a lawfully arrested person and areas within his immediate control" (quoting *Smith v. Ohio*, 494 U.S. 541, 543 (1990)) (internal quotation marks omitted)).  Furthermore, a warrant is not required when a police officer briefly seizes a person and conducts a limited search for weapons, provided the officer "reasonably suspects the person of being involved in criminal activity."  *United States v. Swindle*, 407 F.3d 562, 564 n.2, 566 (2d Cir. 2005) (citing *Terry v. Ohio*, 392 U.S. 1, 27, 30–31 (1968)).  Interactions with the police, particularly if they are extended, may evolve from limited stops or limited searches based on reasonable suspicion into arrests and searches incident to arrest.  *United States v. Restrepo*, 890 F. Supp. 180, 192 (E.D.N.Y. 1995); *see United States v. Vargas*, 369 F.3d 98, 101–02 (2d Cir. 2004).

"On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure." *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citing *United States v. Arboleda,* 633 F.2d 985, 989 (2d Cir. 1980)).  Once the defendant has shown a basis for his motion, the burden shifts

to the government to demonstrate that the search or seizure did not violate the Fourth Amendment. *Id.* (citing *Arboleda*, 633 F.2d at 989, *United States v. Pera*, 986 F.2d 633, 639 (2d Cir. 1993) and *United States v. Pena*, 961 F.2d 333, 338–39 (2d. Cir. 1992)); *see United States v. Bristol*, 819 F. Supp. 2d 135, 143 (E.D.N.Y. 2011) (noting that, on a motion to suppress, the government bears the burden of showing that the requisite suspicion justified a stop). Here, the parties do not dispute that the police officers seized Defendant and searched him without a warrant. Thus, the government bears the burden to demonstrate that the search did not violate the Fourth Amendment.

### a. Search incident to arrest

The government contends that the NYPD officers had probable cause to arrest Defendant when they observed him carrying an open, green bottle while walking on Clarendon Road in Brooklyn and watched Defendant throw that bottle onto the ground. (Opp'n Mem. 10.) The government argues that the discovery of the firearm, which happened close in time to Defendant's arrest, and the subsequent search of Defendant's person and discovery of the ammunition in his pocket, were searches incident to a valid arrest and thus lawful under the Fourth Amendment. (Opp'n Mem. 11.) Defendant does not appear to dispute that police officers may lawfully arrest an individual who litters or has an open container of alcohol in their presence, but rather challenges the credibility of Baldofsky and Fink's testimony as to what they observed on June 6, 2014. Defendant argues that the officers could not have seen him with a bottle or observed him throw the bottle onto the ground given the lighting conditions on Clarendon Road that evening. (*See* Tr. 82:10–16.)

### i. There was no probable cause to arrest Defendant for an open container violation

Arrests are seizures within the meaning of the Fourth Amendment and, in order to be

reasonable, must be based on probable cause. *See United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). Probable cause to arrest "exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983); *see Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001); *United States v. Bernacet*, 724 F.3d 269, 277–79 (2d Cir. 2013) (finding arrest constitutional when it was supported by probable cause to believe defendant had violated his parole, despite New York State law that prohibited arrest for parole violation). An arrest is constitutionally valid if there is probable cause to justify the arrest at its initiation, even if the offense providing probable cause for the arrest is different from the offense ultimately charged. *United States v. Bernacet*, No. 11-CR-107, 2011 WL 10895014, at *4 (S.D.N.Y. Sept. 7, 2011) (finding that arrest was constitutionally valid even though police ultimately charged defendant with different offense than one that initially justified the arrest), *aff'd*, 724 F.3d 269 (2d Cir. 2013); *Sands v. City of New York*, No. 04-CV-5275, 2006 WL 2850613, at *3–4 (E.D.N.Y. Oct. 3, 2006) (finding undisputed facts established probable cause to arrest for littering in § 1983 case); *see also Herron*, 18 F. Supp. 3d at 233 (noting that the ultimate disposition of charges resulting from the arrest is "truly irrelevant" to the question of whether the officer had probable cause to arrest at the time of the arrest).

Under the New York City Administrative Code section 10-125, "[n]o person shall drink or consume an alcoholic beverage, or possess, with intent to drink or consume, an open container

containing an alcoholic beverage in any public place except at a block party" or similar function. N.Y.C. Admin. Code § 10-125(b). A rebuttable presumption that a person is in violation of that section arises when a person possesses an open container containing an alcoholic beverage in a public place. *Id.* § 10-125(c). Open container violations are arrestable offenses, and under New York law, whether probable cause to arrest someone for an open container violation exists "depends on the totality of circumstances at the time of the defendant's arrest, 'which takes into account the realities of everyday life unfolding before a trained officer who has to confront, on a daily basis, similar incidents.'" *United States v. Hooks*, No. 10-CR-934, 2011 WL 102726, at *5 (S.D.N.Y. Jan. 6, 2011) (quoting *People v. Bothwell*, 690 N.Y.S.2d 231, 234 (App. Div. 1999)) (additional quotation marks omitted); *see also United States v. Rodriguez*, 368 F. App'x 178, 180 (2d Cir. 2010) ("[I]t was not clearly erroneous for the District Court to find that the officers had probable cause to arrest defendant because he 'was about to violate the New York City Administrative Code' [section] 10-125(b)-(c)" by walking out of building lobby with an opened bottle of liquor.); *Hooks*, 2011 WL 102726, at *5 (finding officers had probable to arrest defendant for public consumption of alcohol because defendant was drinking from cup with a group of people who were drinking from bottles, one of which the officer identified as a Corona beer bottle).

The facts, as presented at the suppression hearing, do not support a finding that the police officers had probable cause to arrest Defendant for an open container violation. First, it is improbable that the officers were able to discern whether the bottle contained *alcohol*, even if they could perceive that it contained liquid, from the distance they claimed to be standing in relation to Defendant. Both Baldofsky and Fink testified that they did not see the Heineken label on the bottle until later, neither saw Defendant leave a bar or restaurant that might serve

alcoholic beverages and both were aware that nonalcoholic beverages were also sold in green glass bottles similar to the Heineken bottle. (Tr. 39:7–9, 67:4–6, 73:2–4.) Neither smelled alcohol on the bottle or Defendant prior to Defendant's arrest, and both Fink and Baldofsky testified that the bottle could have contained a nonalcoholic beverage. Given the totality of the circumstances, the Court does not find that the police officers had probable cause to arrest Defendant for an open container violation.

### ii. There was probable cause to arrest Defendant for littering

The New York City Administrative Code section 16-118 prohibits throwing or casting "ashes, garbage, paper, dust or other rubbish and refuse of any kind whatsoever" onto a street or public place. N.Y.C. Admin. Code § 16-118(1). "Under New York Penal Law, littering is an arrestable offense if committed in the presence of an officer." *Herron*, 18 F. Supp. 3d at 221 (citing *Rodriguez*, 368 F. App'x at 180) (noting that defendant did not contest that it was an arrestable offense and rather contested the credibility of the officer's testimony that they actually witnessed littering); *People v. Ormsby*, 816 N.Y.S.2d 623, 624 (App. Div. 2006) (finding officer had probable cause to arrest the defendant for both littering and disorderly conduct); *see also People v. Mangum*, 3 N.Y.S.3d 332, 335 (App. Div. 2015) (noting that officers had probable cause to arrest defendant for littering in violation of New York City Administrative Code section 16-118, but finding subsequent search of defendant's backpack unreasonable).

Although Defendant's affidavit makes no mention of a beer bottle, neither stating nor denying that he had one in his hand nor that he threw one on the ground, the police officers credibly testified that they observed Defendant with what they believed to be a beer bottle in his hand, and watched him toss or drop it into the dirt on the public sidewalk. After witnessing these events, the police officers had probable cause to place Defendant under arrest for littering. The

fact that Defendant was not ultimately charged with littering does not undermine the validity of the arrest in these circumstances. *See Bernacet*, 2011 WL 10895014, at *4; *Sands*, 2006 WL 2850613, at *3–4. While not necessary to support their probable cause at the time of the arrest, the officers did collect the beer bottle that Defendant is alleged to have discarded on Clarendon Road, which was in fact a green Heineken beer bottle. (*See* Gov. Ex. 10; Tr. 25:19–26:3.)

### iii. The search was a reasonable search incident to arrest

The Supreme Court has recognized that searches incident to a lawful arrest, conducted based on probable cause, are reasonable when designed to remove any weapons from the arrestee, to otherwise protect officer safety, or to preserve evidence that may be imminently concealed or destroyed. *Riley*, 573 U.S. at ---, 134 S. Ct. at 2483 (quoting *Chimel v. California*, 395 U.S. 752, 762–63 (1969))). While police officers need not show any probability that particular circumstances would lead to the discovery of weapons or evidence, application of the search incident to arrest doctrine should not "untether the rule from the justifications underlying the *Chimel* exception." *Riley*, 573 U.S. at ---, 134 S. Ct. at 2485 (quoting *Arizona v. Gant*, 556 U.S. 332, 343 (2009).)

Here, because the firearm was recovered prior to Defendant's arrest, an additional wrinkle applies to the traditional search incident to arrest doctrine. The government cites *Rawlings v. Kentucky*, 448 U.S. 98, 110–11 (1980), for the proposition that the fact "that the firearm appears to have been recovered a few moments before the defendant was placed in handcuffs does not alter this analysis." (Opp'n Mem. 11.) The Court in *Rawlings* held that a search of the defendant's person, which uncovered money and a knife, was lawful despite the fact that it occurred shortly before the defendant's arrest. *Rawlings*, 448 U.S. at 110–11. At the point of the search, the defendant had already "admitted ownership of the sizeable quantity of

13

drugs found in [his companion's] purse" and the Court found that the police "clearly had probable cause to place [the defendant] under arrest," which arrest "followed quickly on the heels of the challenged search." *Id.* at 111. Defendant argues that "[t]he government cannot rely on an after-the-fact retooling of what actually occurred to render an unwarranted stop and search into an arrest based on probable cause." (Reply Mem. 5.) At oral argument after the suppression hearing, Defendant argued that the police officers were likely stopping and speaking with each individual they encountered, waiting to see if they found something that would lead to an arrest. (Tr. 81:10–25.)

A search incident to arrest need not necessarily occur after formal arrest to be valid, but the argument that the search was incident to arrest becomes more strained when the facts show that a defendant would not have been arrested but for the fact that the search produced evidence of a crime, that is, a firearm.[7] A search incident to arrest is not unlawful simply because it

---

[7] Bootstrapping evidence found in a search "incident to arrest" — based on probable cause for only a minor violation that would otherwise not result in an arrest — so that the fruits of a search incident to arrest themselves provide the justification for the arrest, is not permissible. *See Smith v. Ohio*, 494 U.S. 541, 543 (1990) ("[I]t is axiomatic that an incident search may not precede an arrest and serve as part of its justification.") (internal quotation marks and citation omitted); *United States v. Donaldson*, 793 F.2d 498, 503 (2d Cir. 1986) ("To be sure, care must be taken to avoid bootstrapping that allows the fruits of a search incident to an arrest to provide the basis for the arrest."); *United States v. Friedman*, No. 95-CR-192, 1996 WL 612456, at *15 (E.D.N.Y. June 25, 1996) (finding that case in which three men arrested for possession of firearms after being stopped for traffic violations, who were only arrested following a search of the car and discovery of the firearms, "presents a danger of 'bootstrapping' that is not present in cases such as *Donaldson*") *aff'd in part, rev'd in part*, 300 F.3d 111 (2d Cir. 2002) and *aff'd*, 43 F. App'x 424 (2d Cir. 2002). Construing the doctrine so broadly would encourage police officers to use any minor violation as a pretext to conduct a warrantless search of a defendant's person any time they observe such a violation, running the risk that the search incident to arrest doctrine becomes untethered from the original justifications announced by the Supreme Court in *Chimel*. *See People v. Reid*, 24 N.Y.3d 615, 619–20 (2014) (holding that though probable cause to arrest for driving while intoxicated was present, search incident to arrest was not valid because "the search caused the arrest and not the other way around"); *People v. Magnum*, 3 N.Y.S.3d 332, 334–35 (App. Div. 2015) (holding that although the officers had probable cause to arrest

preceded formal arrest. *See Rawlings*, 448 U.S. at 111; *United States v. Wilson*, 94 F. App'x 14, 17 (2d Cir. 2004) ("Once probable cause was established, it is irrelevant whether the officers' searches of [the defendant] occurred prior or subsequent to his arrest." (citing *United States v. Ricard,* 563 F.2d 45, 49 (2d Cir. 1977)). Similarly, it is not categorically problematic that the defendant was ultimately arrested for something other than the conduct which created probable cause. *See Devenpeck v. Alford*, 543 U.S. 146 (2004). However, some courts have recently noted that a search incident to arrest becomes problematic when, but-for the search, there would have been no arrest. *See People v. Reid*, 24 N.Y.3d 615, 619 (2014) ("It is irrelevant that because probable cause existed, there *could* have been an arrest without a search. A search must be incident to an actual arrest, not just to probable cause that might have led to an arrest, but did not.") (citations omitted); *People v. Magnum*, 3 N.Y.S.3d 332, 334 (App. Div. 2015) ("The intent to arrest for the offense justifying the search must be present even if a defendant is ultimately arrested for a difference offense."); *see also Knowles v. Iowa*, 525 U.S. 113, 119 (1998) (determining search incident to arrest was not valid when police officer issued a traffic citation, searched defendant's car, and then arrested defendant based on what was found in the car,

---

defendant for littering, search of defendant's backpack which revealed a firearm was not a lawful search incident to arrest when it was clear officers were not going to arrest defendant until weapon was found); *see also Donaldson*, 793 F.2d at 503 (noting that the bootstrapping problem does not arise when the defendant's "criminal knowledge and intent were plain, and the agents were well aware of [the] crime" prior to the search); *cf. United States v. Gandia*, 424 F.3d 255, 262 (2d Cir. 2005) (noting that extending the "protective sweep" doctrine, permitting police officers to conduct a warrantless "sweep" of a defendant's home under certain circumstances, to instances where officers have gained access to a home through consent, may "enable and encourage officers to obtain that consent as a pretext for conducting a warrantless search of the home").

In this case, Defendant was ultimately arrested for possession of the firearm and for the open container violation. While his arrest, and the searches incident thereto which recovered the firearm and the magazine, were based on probable cause for the littering offense, as discussed *infra* the Court finds that the concerns of "bootstrapping" are not present here.

because neither of the rationales underlying the search incident to arrest exception were satisfied).

In this case, the facts support a finding that the officers intended, at least, to stop Defendant in order to investigate the open container violation and littering, regardless of whether any contraband or evidence was discovered during the search. Fink had stepped in front of Defendant to question him about the bottle when Defendant pushed into or walked past Fink, making contact with him,[8] and both Fink and Baldofsky quickly determined that Defendant might be armed. Given the rapidly unfolding interaction with Defendant, and the fact that — as discussed below — the limited search of Defendant's waistband area was justified by reasonable suspicion and the need to protect officer safety, the firearm was not unlawfully recovered from Defendant. Moreover, once the police officers did discover the firearm, they had additional probable cause to arrest Defendant, justifying the search of his person which led to the discovery of the ammunition in his pocket. *See Vargas*, 369 F.3d at 102 (affirming denial of motion to suppress firearm found on defendant's person, noting "at the point of finding the gun, the police certainly had probable cause to arrest him"); *United States v. Galan*, No. 14-CR-450, 2015 WL 1602151, at *7 (E.D.N.Y. Apr. 9, 2015) (noting that once police officers found gun defendant had hid in tire of parked vehicle, "the officers clearly had probable cause to arrest [defendant]," justifying search of his pockets). Thus, the search at issue in this action is still tethered to the concerns for officer safety underlying the search incident to arrest doctrine, *see Riley*, 573 U.S. at

---

[8] Baldofsky testified that Defendant pushed into Fink, (Tr. 42:12–43:7), and Fink testified that, when he attempted to stop Defendant, Defendant did not want to be stopped and a brief "scuffle" ensued, (Tr. 57:6–20, 70:5–19, 71:15–24). In his affidavit in support of the motion, Defendant does not indicate whether he made physical contact with the officers before they "chased [him] and forced [him] to the ground," but does state that when he was asked to stop, he "did not stop and continued to walk away from the officers." (Davis Aff. ¶¶ 3–5.)

---, 134 S. Ct. at 2485, and was reasonable within the terms of the Fourth Amendment.

### b. Stop and pat-down

The government argues that even if the police officers did not have probable cause to arrest Defendant for littering and an open container violation, they had reasonable suspicion to believe that Defendant had committed or was about to commit those offenses, and were thus permitted under the Fourth Amendment to conduct an investigatory stop and protective pat-down search of Defendant's person. (Opp'n Mem. 11–13.) The government argues that the following three facts provided the police officers with reasonable suspicion to justify the stop: (1) Defendant was carrying an open beer bottle; (2) Defendant threw the beer bottle onto the ground; and (3) Defendant attempted to shove past the officers when they approached him, making physical contact with Fink. (*Id.* at 13.) Furthermore, the officers observed a bulge at Defendant's waistband, which the government argues justified a search for weapons. (*Id.* at 14.) Defendant argues that there was no reasonable articulable suspicion to stop him, nor did the police officers have a reasonable fear for their safety which would justify the search. (Schneider Decl. 3.)

Police officers are permitted to engage in a "limited detention" of an individual based on the officers' reasonable suspicion that criminal activity is underway. *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992) (citing *Terry*, 392 U.S. at 30). Reasonable force may be used to affect the stop without turning it into an arrest. *See United Sates v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) (no arrest because force was appropriate where suspect fled and then struggled following stop). An officer may investigate in order to prevent or detect criminal activity with a stop which constitutes a less intrusive seizure than an arrest and, if the officer has reason to believe the individual is armed or dangerous, the officer may frisk or pat-down the

individual for weapons. *Id.* at 101. However, even if reasonable suspicion supports an investigatory stop, the stop must still comply with the Fourth Amendment standard of reasonableness. *United States v. Bailey*, 743 F.3d 322, 336 (2d Cir.), *cert. denied*, 135 S. Ct. 705 (2014). "In assessing whether a detention is too long or intrusive to be justified as an investigative stop, courts properly 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Bailey*, 743 F.3d at 336.

### i. There was reasonable articulable suspicion to stop Defendant

Both parties agree that Defendant (1) was verbally ordered to stop in some manner, (2) was blocked by Fink, (3) continued to walk past the officers after being ordered to stop, and (4) engaged in some bodily contact with Fink — whether initiated by the officer or by Defendant — upon walking away. Defendant argues that he was "forced [] to the ground" and subjected to a pat-down search, during which the police officers found the firearm. (Def. Aff. ¶¶ 5–6.) There is no dispute that Defendant was seized at the time that Baldofsky found the firearm in Defendant's waistband; Fink had attempted to stop Defendant, made contact with him, and likely grabbed his arm. The question is whether there was reasonable suspicion to stop Defendant at that time.

Law enforcement officers may temporarily detain a person, absent probable cause, in limited circumstances. *Bailey*, 743 F.3d at 331–32 (2d Cir. 2014) (citing *Terry*, 392 U.S. at 22–25). Specifically, where a police officer has a reasonable articulable basis to suspect that the individual "is committing or has committed a criminal offense," a temporary investigatory stop may be reasonable under the Fourth Amendment. *Bailey*, 743 F.3d at 336. Reasonable suspicion, like probable cause, is determined objectively based on the information available to

the police officers at the time of the stop and not on their subjective state of mind. *United States v. Awan*, 607 F.3d 206, 217 (2d Cir. 2010). While the requisite suspicion "is not a high threshold," *United States v. Lawes*, 292 F.3d 123, 127 (2d Cir. 2002), it is "more than a hunch," and requires "specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing." *Bailey*, 743 F.3d at 336 (internal citations and quotation marks omitted) (citing *Terry*, 392 U.S. at 21 and *United States v. Arvizu*, 534 U.S. 266, 273 (2002)); *United States v. Rivera*, 353 F. App'x 535, 536 (2d Cir. 2009). In addition to being supported by reasonable suspicion, a valid investigatory stop must be "justified at its inception." *United States v. Lopez*, 321 F. App'x 65, 67 (2d Cir. 2009) (quoting *Terry*, 392 U.S. at 20). "Any events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013).

Baldofsky and Fink credibly testified that they saw Defendant holding a bottle in his hand which both believed they could identify as a Heineken beer bottle, saw him toss it to the ground, and attempted to stop Defendant to inquire further into his behavior. Defendant did not stop, and instead continued to walk past the police officers, brushing into Fink. Though, as discussed above, these facts may not rise to the level of probable cause, they support reasonable suspicion that Defendant had been consuming alcohol on the street or littering in violation of the New York City Administrative Code. *See Lopez*, 321 F. App'x at 67 (finding that officers having seen defendant drinking outside a bar at 4:00 AM from a cup which appeared to contain beer, that defendant was unsteady on his feet supported reasonable suspicion that defendant violated public consumption law); *Galan*, 2015 WL 1602151, at *6 (noting that defendant having

dropped the cup that police officer believed contained alcohol further added to the officer's suspicion that defendant might be in violation of open container laws); *United States v. Barton*, No. 06-CR-151-1, 2007 WL 2220483, at *3 (D. Vt. Aug. 1, 2007) (finding officer had reasonable suspicion to believe defendant was involved in criminal activity after officers observed defendant litter, noted defendant smelled of marijuana, and saw that he possessed an empty gun holster); *see also United States v. Rios*, No. 09-CR-369, 2009 WL 2602202, at *4 (E.D.N.Y. Aug. 24, 2009) (finding that police officer had reasonable suspicion to conduct an investigatory stop of defendant who was riding his bicycle on the sidewalk in violation of the New York City Administrative Code). Given Fink and Baldofsky's experience and recognition of the size and shape of the bottle, and Defendant's behavior in tossing the bottle to the ground shortly before encountering the police officers, Fink and Baldofsky had reason to inquire further as to what the bottle may have contained. It was appropriate for Fink to attempt to stop Defendant for limited questioning about his behavior.

### ii. The pat down was supported by reasonable suspicion

Where there is a lawful investigatory stop, officers who reasonably suspect that the individual stopped is armed may conduct a protective frisk for weapons. *See Terry*, 392 U.S. at 23; *Bailey*, 743 F.3d at 332 ("To support an accompanying patdown, there must be a reasonable basis to think 'that the person stopped is armed and dangerous.'" (quoting *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009)), *cert. denied* 135 S. Ct. 705 (Dec. 1, 2014); *see also Holeman v. City of New London*, 425 F.3d 184, 192 (2d Cir. 2005) (late night encounter in high-crime area with convicted narcotics felon who was acting suspiciously). The standard for reasonable suspicion to justify a protective pat down is the same as that to justify an investigatory stop: it must be based on "specific and articulable facts" which provide a reasonable basis to conclude

that the person stopped "*may* be armed and presently dangerous." *Bailey*, 743 F.3d at 332

(citations and internal quotation marks omitted). If reasonable suspicion is present, the officer

"may take steps to assure [him]self that the person with whom []he is dealing is not armed with a

weapon that could unexpectedly and fatally be used against h[im]." *Wilson*, 94 F. App'x at 15–

16 (quoting *United States v. Salazar,* 945 F.2d 47, 49 (2d Cir. 1991)) (internal quotation marks

omitted).

The police officers here had reasonable suspicion to believe that Defendant was armed.

Fink and Baldofsky both witnessed a bulge in Defendant's waistband which, based on their

training and experience, they believed could be a weapon. Shortly after Defendant and Fink

made physical contact, at the time Fink attempted to stop Defendant, Fink hit the bulge with his

hand and determined that it felt and sounded metallic, like a firearm might sound. Given these

observations, the officers had reasonable suspicion to believe that Defendant was armed and

could be dangerous, and thus were justified in conducting the limited protective pat-down search,

which involved lifting Defendant's shirt and removing the firearm from his waistband.[9] *See*

*United States v. Williams*, 526 F. App'x 29, 32 (2d Cir. 2013) (police officer's observation of

bulge on the right side of defendant's thigh, combined with defendant's "hostile response" to

investigatory stop provided reasonable suspicion to justify protective pat down) *cert. denied*, 134

S. Ct. 1911 (2014); *Rios*, 2009 WL 2602202, at *5 (police officer's observation of gun-shaped

"outline" in defendant's pants pocket when defendant dismounted his bicycle provided

reasonable suspicion that defendant was armed and dangerous).

---

[9] As discussed above, the magazine was found in the process of a lawful search incident
to arrest, supported by probable cause following the littering and recovery of the firearm. *Cf.*
*Bailey*, 743 F.3d at 333 (noting that probable cause is "a higher standard than reasonable
suspicion").

### iii. The seizure did not exceed the permissible scope of an investigative stop

Even if reasonable suspicion supports an investigatory stop and pat down, the scope and duration of the stop must still be reasonable within the bounds of the Fourth Amendment. *Bailey*, 743 F.3d at 336. The government contends that the stop and search were brief and limited in purpose, for the protection of the officers. (Opp'n Mem. 13–14.) Defendant disputes the government's version of the facts, contending that the search involved a "comprehensive physical search of his person." (Schneider Decl. 3.)

The time and manner in which Defendant was stopped and the duration of the subsequent search, all of which began at the moment Fink and Baldofsky attempted to stop Defendant and ended when Defendant was formally placed under arrest, did not exceed the scope of a permissible investigatory stop. The testimony showed Fink attempted to stop Defendant to question him regarding the open container violation and littering by standing in the middle of the sidewalk, and Defendant continued to walk past Fink, making physical contact with him. Within a matter of seconds, Fink and Baldofsky both recognized a large bulge at Defendant's waistband as a potential weapon, Fink grabbed Defendant by the arm and shoulder, and Baldofsky retrieved the firearm from Defendant's waistband. Having determined that Defendant had been armed, Fink and Baldofsky secured the weapon and restrained Defendant for approximately forty-five seconds until backup arrived and Defendant was arrested. Given the concern for officer safety, as well as the fact that Fink and Baldofsky had probable cause to arrest Defendant at the time he was restrained, the Court finds that the limited detention and pat down prior to Defendant's formal arrest did not violate the Fourth Amendment.

## III. Conclusion

For the foregoing reasons, the Court denies Defendant's motion to suppress.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: July 1, 2015
      Brooklyn, New York